# In the United States Court of Federal Claims

No. 20-835C
(Filed Under Seal:  October 28, 2020)
(Reissued for Publication:  November 19, 2020)[*]

```
************************************ *
WISCONSIN PHYSICIANS SERVICE          *
INSURANCE CORPORATION,                *
                                      *
              Plaintiff,              *
                                      *
      v.                              *
                                      *
THE UNITED STATES,                    *
                                      *
              Defendant,              *
                                      *
      and                             *
                                      *
NATIONAL GOVERNMENT SERVICES,         *
INC.,                                 *
                                      *
              Defendant-Intervenor.   *
************************************ *
```

Postaward Bid Protest; Cross-Motions for
Judgment on the Administrative Record;
Standing; Evaluation of Proposals;
Technical Acceptability; Disparate
Treatment Allegations; OCI Mitigation

<u>Daniel P. Graham</u>, Washington, DC, for plaintiff.

<u>Rafique O. Anderson</u>, United States Department of Justice, Washington, DC, for defendant.

<u>Anuj Vohra</u>, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

---

[*]  The court issued this Opinion and Order under seal on October 28, 2020, and directed the parties to submit proposed redactions by November 17, 2020.  The parties filed a status report in which they indicate that certain redactions are agreed to by all parties.  Those redactions are acceptable to the court.  Defendant and defendant-intervenor further agreed to certain redactions to Section II.B.4 of this opinion, which plaintiff opposes.  The court adopts the disputed redactions for the following primary reasons:  (1) this opinion analysis section is an alternative review of the merits of a protest ground that has already been dismissed on standing grounds; (2) the topic of the analysis, the parties' arguments concerning a conflict of interest mitigation plan, is fact-specific and not readily applicable to other procurements; (3) the redacted material would expose confidential and proprietary information in a highly competitive marketplace.  All redactions are indicated by bracketed ellipses ("[. . .]").

**SWEENEY**, Senior Judge

In this postaward bid protest, plaintiff Wisconsin Physicians Service Insurance Corporation ("WPS") contends that the Centers for Medicare and Medicaid Services ("CMS"), part of the United States Department of Health and Human Services, improperly eliminated the proposal submitted by WPS from a competition to provide Medicare Administrative Contractor ("MAC") services. The awardee of the contract, National Government Services, Inc. ("NGS"), intervenes in this suit. WPS seeks a permanent injunction of the award to NGS.

Before the court are cross-motions for judgment on the administrative record filed by WPS and the United States pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims, along with a combined motion to dismiss and cross-motion for judgment on the administrative record filed by NGS. For the reasons set forth below, the court grants in part and denies in part NGS's motion to dismiss, grants NGS's and defendant's motions for judgment on the administrative record, and denies WPS's motion for judgment on the administrative record and its request for permanent injunctive relief.

## I. BACKGROUND

### A. History of the Procurement

#### 1. Request for Proposal

CMS contracts with MACs to provide Medicare Part A and Part B claims administration and ancillary services; CMS divides this work among regional jurisdictions. Corrected Administrative R. ("AR") 81-82, 131. On February 1, 2019, CMS issued Request for Proposal No. 75FCMC19R002 ("RFP") for Jurisdiction 6 ("J6"), which includes Illinois, Minnesota, and Wisconsin.[1] Id. Tab 10. The contracting vehicle is a "Cost Reimbursement type contract," with a primary pricing structure of Cost-Plus-Award-Fee. Id. at 1790. If all six option years are exercised, the awarded contract would be performed for seven years. Id. at 1798.

The RFP was amended on March 5, 2019, and again on March 21, 2019. Id. Tabs 17-18. Offerors were to submit their proposals in five separate volumes: Administrative Requirements and Responsibility Determination; Proposal Assumptions; Technical Proposal; Business Proposal; and Conflict of Interest. Id. at 1879. Proposals were due on April 1, 2019. Id. at 1878.

#### 2. Evaluation Scheme

CMS chose a best-value evaluation model where "[a]ward will be made to the Offeror whose proposal offers the best overall value to the Government." Id. at 1915. Accordingly, the

---

[1] J6 includes additional types of Medicare claims administration services for other states and territories. AR 173.

RFP "permits tradeoffs among cost or price and the non-cost factors and allows the Government to accept other than the lowest priced proposal." Id.  The three evaluation factors in this MAC selection process are Technical Approach, Past Performance, and Cost/Price.  Id. at 1915-16.

The three evaluation factors are divided into two categories:  (1) the technical evaluation of non-cost/price factors, which includes both the Technical Approach and Past Performance factors; and (2) the Cost/Price factor.  Id.  To arrive at the best-value proposal, the following weighting scheme applies:  (1) the "Technical Approach evaluation factor is more important than the Past Performance evaluation factor"; and (2) "Technical Approach and Past Performance, when combined, are significantly more important than cost or price."  Id. at 1915.  For the non-cost/price factors, the evaluators would identify strengths, weaknesses, significant weaknesses, and deficiencies in the offerors' proposals.  Id. at 1192.  The evaluation of the cost/price of proposals is not a primary issue in this protest, but that process, which does not produce an evaluation rating, includes "a price analysis, cost analysis, and cost realism analysis." Id. at 1916.

The Past Performance evaluation factor pertains to relevant past performance information that "is expected to demonstrate the likelihood that the prospective contract will be performed successfully." Id. at 1894.  Possible ratings under this factor are High Confidence, Solid Confidence, Satisfactory Confidence, Low Confidence, or Neutral, all tied to the level of the evaluators' "expectation that the Offeror will successfully meet the contract performance requirements."  Id. at 1192.  A Neutral rating on this factor is only assigned to offerors with "no record of relevant past performance."  Id.

The key evaluation factor for the disputed issues in this protest is Technical Approach. This factor is composed of three criteria, each of which is addressed in a separate tab in the offeror's Technical Proposal volume:  Program Management, Staffing Plan, and Mission Essential Functions ("MEFs," or "MEF" when discussing just one element within the MEFs evaluation criterion).  Id. at 1890.  The MEFs criterion is subdivided into seven MEFs: Implementation, Provider Enrollment, Provider Customer Service Program, Claims Processing, Appeals, Medical Review, and Audit & Reimbursement.  Id. at 1899.  Possible ratings under the Technical Approach factor are Excellent, Good, Acceptable, and Unacceptable.  Id. at 1191.

CMS would also look outside the offeror's Technical Proposal volume by examining the offeror's underlying assumptions, to better understand the offeror's Technical Approach.  Id. at 1888-89.  Much of the attention in this protest is focused on the Basis of Estimate ("BOE") spreadsheet that each offeror would supply in its Proposal Assumptions volume.  Id.  According to the RFP, "the BOE and other relevant historical data available to CMS [would] be used as a baseline tool for measuring and understanding how the Offeror proposes to perform the [Statement of Work ("SOW")] requirements in contrast to how the Offeror has historically performed MAC work or similar work."  Id. at 1888.  The spreadsheet template was provided by CMS and many of the formulas for populating the cells of the spreadsheet were fixed and could not be altered.  Id. Tabs 72-73.  Of interest here, the data in the BOE addressed labor categories and workloads that staff would be assigned:  "[T]he Offeror shall document all proposed labor categories, workload-driven and non-workload-driven estimating factors, direct labor factors,

proposed and historic productivity factors, and all other data required by the BOE form and its instructions." Id. at 1888.  Additional aspects of the BOE and the Technical Approach evaluation factor will be addressed in the court's analysis below.

### 3.  Evaluation of Proposals

Four proposals were received by CMS, all from experienced MACs:  NGS, WPS, Palmetto GBA ("Palmetto"), and CGS Administrators, LLC ("CGS").  Id. at 2443, 3860, 6308, 6849, 7987.  A Technical Evaluation Panel ("TEP") evaluated the offerors' non-cost/price factors and rated WPS Unacceptable under Technical Approach and Low Confidence under Past Performance.  Id. at 8101.  The contracting officer ("CO"), who was also the source selection authority, eliminated WPS from further consideration in the competition based on her agreement with the TEP's ratings.  Id. Tab 32.

Pursuant to the CO's decision dated February 12, 2020, WPS was the only offeror eliminated at this stage of the evaluation process.  Id. at 7986.  The CO's elimination of WPS was solely based on the Unacceptable rating received for WPS's Technical Approach, and was not founded on WPS receiving the lowest possible rating for Past Performance:  "Given the collective significant weaknesses and weaknesses outlined above, with the technical approach being more important than past performance, WPS's technical approach has been determined unacceptable.  Therefore, I am removing this proposal from further consideration for award, as it is technically unacceptable."  Id. at 8004.  Much of this protest is focused on two significant weaknesses and an additional weakness identified in WPS's Technical Approach; these will be discussed in detail below.

The record shows that WPS's elimination from the competition came before distinct, additional procedures were undertaken to review the proposals of the three remaining offerors.  Although all four proposals received a preliminary, limited cost realism analysis, id. Tab 28, a far more extensive cost realism analysis significantly increased the evaluated prices of the proposals submitted by NGS, Palmetto, and CGS, see id. at 8626 ("Cost Realism adjustments were not performed on Offerors[] rated Unacceptable.  These Offeror[]s were removed from consideration for award.").  Further analysis of the costs and prices of NGS, Palmetto, and CGS, but not WPS, was conducted by the "Business Evaluation Panel" for this procurement.  See id. Tabs 49-51.  The record shows no indication that a competitive range of proposals was designated, or that formal discussions were held with the offerors remaining in the competition.

CMS selected NGS for contract award as providing the best value to the government.  Id. at 8723.  Of the three remaining offerors, all of which were rated at least Acceptable on Technical Approach and at least Solid Confidence on Past Performance, the price of NGS's proposal was lower than that of one competitor but higher than that of the other.  Id. at 8626.  The CO justified NGS's higher price by noting "the nature of NGS's technical superiority" and "how the strengths awarded indicate that NGS's proposal is the lowest risk to the taxpayer while also adding value in terms of providing the government with innovations and efficiencies in performing their work."  Id. at 8723.  The CO also determined that NGS had adequately addressed any conflict of interest (either "COI," as used in the RFP, or "OCI," for organizational

conflict of interest).  See id. at 8409 (stating that NGS "has no existing unmitigated, significant COIs that have not been resolved and is, therefore, eligible for award").

## B. Protest History

On February 14, 2020, WPS requested a debriefing regarding its exclusion from the procurement; it received a written debriefing on March 6, 2020.  Id. Tabs 35, 40.  Subsequently, WPS filed a timely protest with the Government Accountability Office ("GAO"), which was denied on June 17, 2020.[2]  Id. Tabs 63-70.  WPS filed the instant protest in this court on July 9, 2020, and amended its complaint on July 30, 2020.  In its amended complaint, WPS asserts five claims for relief:  three challenging the assignment of weaknesses to its proposal, one challenging the assignment of a Low Confidence rating for its Past Performance, and one challenging CMS's consideration of NGS's OCIs.  The parties proposed a briefing schedule so that the court's ruling on WPS's request for permanent injunctive relief would issue before November 13, 2020.  None of the parties requested oral argument and this matter is ripe for decision.

## II. DISCUSSION

In their briefs, the parties address WPS's standing to protest and WPS's elimination from the competition.  The court begins its analysis with the threshold issue of standing, which focuses on WPS's chances for award if the procurement errors alleged in the amended complaint had not occurred.  The court then turns to WPS's elimination from the competition due to its Unacceptable rating on Technical Approach.  For the next step in the analysis, the court returns to the question of standing because, according to NGS, if the Unacceptable rating withstands review, WPS has no standing for its remaining protest grounds.  Finally, the court makes alternative findings regarding the merits of WPS's remaining protest grounds, which are related to NGS's OCIs.

### A. Legal Standards

#### 1. Standing

As a threshold matter, NGS moves to dismiss the entirety of WPS's bid protest for lack of standing.  "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  Under 28 U.S.C. § 1491(b)(1), bid protests may only be brought by "interested parties."  To have standing, a protestor must establish that it (1) is an actual or prospective offeror and (2) possesses a direct economic interest in the award of the contract.  CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015).

---

[2]  Due to procedural differences, the GAO protest sheds no light on the issues before the court.

The test for direct economic interest in a postaward protest is whether the protestor had a "substantial chance" of winning the contract.  Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006)).  The protestor must show, in other words, that "it had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest."  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

In addition, to establish standing the protestor must show that it was prejudiced by the procuring agency's conduct.  Diaz v. United States, 853 F.3d 1355, 1358 (Fed. Cir. 2017); see also Info. Tech. & Applications Corp., 316 F.3d at 1319 ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing.").  Thus, to demonstrate prejudice and standing, the protestor must establish that it had a substantial chance of contract award "but for the alleged error[s] in the procurement process."  Info. Tech. & Applications Corp., 316 F.3d at 1319 (citing Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

If an offeror is rated technically acceptable, is among the finalists for contract award, and has a substantial chance of contract award, it generally has standing to challenge all of the alleged errors made by the procuring agency.  See, e.g., Cyios Corp. v. United States, 122 Fed. Cl. 726, 736 (2015) (concluding that the protestor, one of six finalists for award, had standing to challenge technical ratings, past performance ratings, and cost/price analyses), aff'd, 674 F. App'x 1016 (Fed. Cir. 2017).  If, however, an offeror's proposal is eliminated from the competition as untimely, technically unacceptable, or otherwise failing to merit consideration as a finalist, the offeror may only have standing to challenge the agency's ruling on its elimination—if the elimination was proper, the protestor will lack standing to challenge subsequent alleged errors in the procurement such as the agency's choice of the awardee among the finalists for contract award.  See, e.g., Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1380-81 (Fed. Cir. 2009) (holding that an offeror that submitted an untimely proposal lacked standing to challenge subsequent procurement procedures); MCI Diagnostic Ctr., LLC v. United States, 147 Fed. Cl. 246, 275, 285 (2020) (dismissing a protest on standing grounds after concluding that the protestor's proposal was properly eliminated from the competition as technically unacceptable); Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 735 (2008) (holding that an offeror that was properly eliminated from the competitive range lacked standing to challenge the agency's contract awards).

## 2.  Arbitrary and Capricious Standard of Review

The parties also move for judgment on the administrative record, seeking either to overturn or defend CMS's actions.  The court reviews challenged agency actions in a procurement pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United

States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under the arbitrary and capricious standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (2001); accord Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential."  Advanced Data Concepts, Inc., 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").  Furthermore, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater [in negotiated procurements] than in other types of bid protests."  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  In addition, technical evaluation ratings produced by the procuring agency, in particular, are entitled to deference. E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."); accord Goldschmitt & Assocs., LLC v. United States, 149 Fed. Cl. 401, 405 (2020) ("[T]his Court gives great deference to 'evaluations of proposals for their technical quality' by 'an agency's subject-matter experts.'" (quoting RX Joint Venture, LLC v. United States, 145 Fed. Cl. 207, 213 (2019))).

"[O]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations."  Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) (alteration in original) (quoting Andersen Consulting Co. v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992)).  Further, in addition to identifying "a significant error in the procurement process," a protestor must show "that the error prejudiced it."[3]  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996);

---

[3]  Prejudice is thus measured twice if the protestor establishes that a significant error marred the procurement.  See, e.g., L-3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 289

see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"). "[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." Data Gen. Corp., 78 F.3d at 1562.

### B. Analysis

#### 1. Standing

As stated above, the court begins by addressing WPS's standing to protest. In its amended complaint, WPS challenges every weakness and significant weakness assigned to its Technical Approach by the CO, and also challenges its Low Confidence rating on Past Performance. None of these challenges is frivolous. NGS and defendant argue, nonetheless, that even if WPS had not been eliminated from the competition, it did not have a substantial chance of being awarded the MAC contract for J6. The court does not agree with the conclusions NGS and defendant reach in this regard.

If WPS could persuade the court to invalidate each of the significant weaknesses and the weakness assigned to its Technical Approach, and also successfully challenge its Low Confidence rating on Past Performance, its ratings on the non-cost/price factors would be significantly improved. WPS also had a significant advantage over the other three offerors on the Cost/Price factor, at least as far as the unadjusted prices were concerned. Even assuming, in a but-for scenario, that the cost realism adjustment for WPS would be at the top end of the range of cost realism adjustments added to the prices of the remaining three offerors, WPS would still be the lowest-price offeror. In this best-value procurement, the price advantage, and the absence of the negative evaluation ratings challenged here by WPS, assure the court that WPS "had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." Info. Tech. & Applications Corp., 316 F.3d at 1319. The record before the court supports a finding that WPS, an experienced MAC, has standing to challenge its elimination from the J6 MAC competition.

#### 2. Unacceptable Rating for WPS's Technical Approach

The key issue in this protest is whether the Unacceptable rating for WPS's Technical Approach survives arbitrary and capricious review. In the agency's Source Selection Plan, the

---

(2011) ("The difference between the two [prejudice standards] is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true.").

definition of an Unacceptable rating on this factor is quite straightforward:  "The Offeror proposed an inadequate technical approach and understanding of the SOW requirements.  Risk of unsuccessful performance is high."  AR 1191.  The rating of Unacceptable that removed WPS from the competition is supported by three identified weaknesses or significant weaknesses in the proposal submitted by WPS, and each of these negative ratings will be discussed.  The court's analysis begins with an examination of the assigned weakness, turns next to the significant weakness that receives less attention from the parties, and ends with the significant weakness that presents the greatest degree of complexity.

As a brief introduction to the parties' dispute, the court provides an overview of the ratings received by WPS for its Technical Approach.  There are three key terms used by CMS.  First, "[a] strength adds value to the requirement and it is worthy of being noted.  That part of a proposal . . .  add[s] benefit and value to the government or is expected to increase the quality of the Offeror's performance.  **Simply meeting the Statement of Work requirements is <u>not</u> considered a strength**."  <u>Id.</u> at 1192.  Second, a weakness is "a flaw in the proposal that increases the risk of unsuccessful contract performance."  <u>Id.</u> (citing Federal Acquisition Regulation ("FAR") 15.001).  Third, a significant weakness is "a flaw in the proposal that appreciably increases the risk of unsuccessful contract performance."  <u>Id.</u> (citing FAR 15.001).

As stated above, the three evaluation areas that together constitute Technical Approach are Program Management, Staffing Plan, and MEFs.  <u>Id.</u> at 1890.  WPS's sole assigned strength for this factor was in Program Management for the "Medicare knowledge and experience" of its key personnel.  <u>Id.</u> at 7992, 8102.  For its Staffing Plan, WPS received a weakness related to that plan's effect on the Provider Enrollment MEF.  <u>Id.</u> at 7998-99.  WPS received its first significant weakness for the Medical Review MEF.  <u>Id.</u> at 7992-94.  WPS's other significant weakness was, generally speaking, for the type of labor categories assigned by WPS to complete requirements for five of the seven MEFs, as well as for the information that supported its staffing of these MEFs.  <u>Id.</u> at 7994-98.  WPS's Technical Approach was assigned no deficiencies.  <u>Id.</u> at 7999.

Consistent findings regarding WPS's Technical Approach are found in:  (1) the CO's "Determination of Removal of Unacceptables from Further Consideration" ("CO Determination Document"), dated February 12, 2020; (2) the TEP report, dated February 25, 2020; and (3) WPS's written debriefing, dated March 6, 2020.  <u>See id.</u> Tabs 32, 38, 40.   The official award decision set forth in the Source Selection Authority Decision Memorandum, signed July 14, 2020, refers to the CO Determination Document as the source for "[a]dditional information [regarding the] removal" of WPS from the competition.  <u>Id.</u> at 8627.  The court therefore relies principally on the CO's Determination Document, and only turns to the TEP report when a more detailed explanation of the TEP findings that underlie the Unacceptable rating adopted by the CO is needed.[4]

The CO summarized the Unacceptable rating for WPS in the CO Determination

---

[4]  The TEP report is less authoritative than the CO Determination Document because the TEP report does not fully explain the CO's elimination decision.

Document:

>WPS' staffing plan was the source for the majority of the weaknesses and
>. . . all of the significant weaknesses.  One issue that spanned all areas of the
>staffing was WPS' contradictory and ambiguous data in the technical proposal
>and in the Basis of Estimate (BOE) regarding many of the requirements from the
>RFP.  I am particularly concerned with . . . WPS' conflicting information
>regarding the number and sources of staff for the Mission Essential Functions
>(MEFs), and its impact on the proposed staffing plan.  WPS failed to provide
>information and data that was required in the RFP in portions of its technical
>proposal and BOE, which generated weaknesses and significant weaknesses in
>WPS' technical approach leading to sizable understaffing of the proposal.
>Overall, there is a significant high risk to contract performance as a result of the
>proposed staffing plan, especially with the implementation of a new jurisdiction
>for the MAC as a critical factor.

Id. at 7992.  The CO also prefaced her discussion of the weaknesses and significant weaknesses
in WPS's Technical Approach with a remark that she "determined" that those weaknesses and
significant weaknesses "collectively contributed to determining that WPS' proposal was
technically unacceptable, thus removing WPS from further consideration for award[.]"
Id.  Thus, the CO's elimination decision is supported both by very specific findings of the TEP,
which are reproduced in the CO Determination Document, and by her integration of those
findings in a broader critique of the staffing data in WPS's proposal.

Before entering the maze of negative ratings assigned to WPS's Technical Approach, the
court makes two observations.  First, the CO's concern regarding J6 MAC contract staffing
evidences the agency's concern about the legitimacy of an offeror's costs.  CMS determined that
"[i]n view of the degree of change to the MAC contracts and the uncertainty of workload
volumes, a cost reimbursement contract type is appropriate for the Jurisdiction 6 MAC contract."
Id. at 1150.   Thus, although the contract involves large sums of money paid to the J6 MAC,
typically over the course of seven years, the restraint on the cost of these services that would be
available under a firm, fixed-price contracting vehicle is absent.  Cf. Sterling Millwrights, Inc. v.
United States, 26 Cl. Ct. 49, 100 (1992) (noting "the dangers of excessive costs associated with
cost reimbursements contracts").  Because CMS is obliged to use a cost reimbursement
contracting vehicle for this MAC contract, an offeror's staffing approach must efficiently
accomplish the tasks set forth in the RFP's SOW and merit the costs reimbursed by the
government.

Second, CMS's concern with staffing also reflects a need for high quality MAC services.
CMS determined that the J6 MAC contract requires "exceptional performance."  AR 1151.
Through the administration of an award fee program, CMS would encourage the awardee to
adapt to changing circumstances and to improve performance over the life of the contract.  Id. at
1151-52.  In its BOE and other staffing information, therefore, each offeror was required to
demonstrate how its staffing plan is poised to fulfill SOW requirements and to improve
performance, as spurred on by the incentive of award fees, throughout the life of the contract.

-10-

With these concepts in mind, the court turns to the underlying findings that support the CO's elimination of WPS's proposal as technically unacceptable.

### a.  Weakness in Staffing Plan

First, the CO assigned a weakness to WPS's Staffing Plan as it affected the Provider Enrollment MEF.  Id. at 7998-99.  The CO cited specifically to certain pages in WPS's proposal in sections titled "Total Proposed Staffing" and "Mission Essential Function (MEF) Staffing," id. at 7107, 7122, in which WPS describes how Provider Enrollment would be staffed, id. at 7110, 7123-24, 7129, 7134, 7137.  Based on her review of these proposal statements, the CO found that WPS's "proposal features are a risk to successful contract performance because WPS' proposed staffing plan (including its management plan) will not provide knowledgeable, quality personnel in sufficient number in order to ensure quality base year performance starting on day one of operations . . . and throughout the remaining contract periods." Id. at 7999.  The CO's criticism of WPS's Staffing Plan addresses the potential for understaffing and her concerns regarding WPS's proposed "level of management oversight," and its "management span of control" for Provider Enrollment.  Id. at 7998-99.

WPS argues that it provided sufficient information in its BOE to allay any concerns that CMS might have had about supervisor/staff ratios for Provider Enrollment.  According to WPS, "[i]f CMS wanted additional information, or information provided in a different format, it could easily have included such a requirement in the RFP."  Pl.'s Mot. 47.  WPS also asserts that it was unreasonable for CMS to downgrade its proposal for information that was merely desirable but not required.  WPS further argues that CMS must have ignored relevant staffing information provided in the BOE.

As the court reads the RFP and WPS's proposal, however, the CO could rationally find that WPS's proposal narrative regarding the staffing of Provider Enrollment was "insufficient," "unsupported," "unclear," and generally inadequate to ensure proper staffing and supervision for this MEF.  AR 7998-99.  The RFP requires that very specific information be included in the narrative section of the proposal that addresses staffing.  Id. at 1897-98.  It is irrelevant that WPS's BOE allegedly included clarifying data that would have allayed the CO's concerns, if CMS had analyzed the data in certain cells of that spreadsheet in a certain way.  See Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 263 (2012) (stating that the procuring agency is "not required to scour other [proposal] volumes for relevant material" (citing Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 786-87 (2011))).  After all, it is the offeror's responsibility to provide technical evaluators with a well-written proposal.  KSC Boss All., LLC v. United States, 142 Fed. Cl. 368, 385 (2019) (citing Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. 735, 744 (2009)).  In other words, the TEP and the CO were under no obligation to discern what WPS "intended to communicate," because it was WPS's obligation to "adequately address this important requirement."  See id. at 382.  Here, because WPS did not clearly show how its Staffing Plan met RFP requirements for the Provider Enrollment MEF, the weakness assigned to WPS's Staffing Plan survives arbitrary and capricious review.

### b.  Significant Weakness for Medical Review

Next, the CO assigned a significant weakness to WPS's Medical Review MEF.  Medical Review ("MR") is difficult to summarize because it involves a great variety of tasks and strategies.  AR 1902-03.  WPS asserts that the overall goal for MR is to "reduce the claims payment error rate in the contractor's jurisdiction."  Pl.'s Mot. 44 (citing AR 1563).  NGS observes that the description of MR in the RFP shows that CMS was seeking a description of how the offeror would categorize claims, and then how it would prioritize the review of certain types of claims with the greatest risk, to show that its MR strategy would be adapted to conditions specific to J6 and would produce maximal results.  The court turns to the RFP for additional guidance.

The SOW contains the following general introduction to MR:

The MR program is designed to promote a structured approach in the interpretation and implementation of Medicare policy, most often requiring the evaluation of medical records to determine the medical necessity of Medicare claims.  The goal of the Contractor's MR program is to reduce the claims payment error rate by identifying, through analysis of data and evaluation of other information, program vulnerabilities concerning coverage and coding made by individual providers and by taking the necessary action to prevent or address the identified vulnerabilities.

AR 1563.  The RFP also includes a number of statements in its instructions regarding the proposal narrative to be provided for MR.  The first three bulleted statements in these instructions paint the MR MEF in broad strokes:

Provide your proposed strategy and approach to handling the proposed medical review workload volumes for this contract, to include:  the workload category as defined in the RFP (prepay and postpay medical record provider specific probe review, etc.), separately for Part A, Home Health (if applicable), Hospice (if applicable), Part B and Durable Medical Equipment (if applicable) and the identification of the types of claims the Offeror will focus on for review (e.g., Skilled Nursing Facility (SNF), therapy services, etc.).

Describe your process for ensuring varied and quality medical reviews are conducted throughout the year.  Include in this discussion your approach to conducting data analysis for the jurisdiction and how this proposed data analysis impacts the proposed focus of the claim reviews.

Describe how the Offeror's understanding of the jurisdiction-specific risk points for this contract resulted in the Offeror's anticipated claim-type reviews (and volume per claim type) and the expected benefits to the Medicare Program and/or return on investment the Offeror anticipates by focusing on these claim types.  Indicate the number and the level of experienced staff proposed for conducting

the activities identified in the prioritized problem list of the Offeror's proposed
strategy.

Id. at 1902-03.

The rationale for the significant weakness assigned to WPS's MR MEF is multi-faceted.
Part of the CO's concern is related to WPS's approach to the "implementation of a new
jurisdiction" as a MAC.  Id. at 7992-94.  The other criticized aspects of WPS's MR include the
proposed workloads for certain tasks to be accomplished by line staff, and the proposed number
and assigned roles of supervisors working on MR.  Id. at 7993-94.  The CO emphasized that MR
"is a critical aspect of the contract," id. at 7992, and concluded that "WPS' proposed approach
for this MAC mission-essential function does not demonstrate an understanding of the SOW
requirements and will likely result in significant understaffing," id. at 7994.

WPS only challenges the "implementation of a new jurisdiction" aspect of the significant
weakness for MR, which has two consequences.  First, the specific workload and supervisory
flaws noted by the CO are unchallenged.  Defendant argues that because WPS does not challenge
these two bases for the significant weakness for MR, it cannot prevail on its MR argument:
"WPS has also not challenged CMS's other two findings that were the bases of WPS's
significant weakness for Medical Review.  The Court should consider that argument abandoned
and find in the Government's favor."  Def.'s Reply 15 (citing PlanetSpace, Inc. v. United States,
92 Fed. Cl. 520, 524 (2010)).[5]  Similarly, NGS contends that "even if WPS prevails on the single
challenge it continues to pursue, it cannot demonstrate prejudice given that any one of the three
bases cited by CMS would serve as the factual predicate for its negative evaluation finding."
NGS Reply 12.  The record reflects that the two unchallenged flaws, standing alone, justify the
significant weakness notwithstanding any potential error in the "new jurisdiction" finding of the
CO.  The court therefore concludes that plaintiff has not met its burden to establish that a
significant, prejudicial procurement error invalidates the significant weakness that the CO
assigned to WPS's proposal for its MR MEF.

The second consequence of plaintiff's sole focus on the "new jurisdiction" critique of its
MR MEF is that to the extent that WPS could prevail with its narrow challenge, there is no need
to discuss every MR flaw the CO found in WPS's proposal.  Instead, the court will restrict its
discussion to the alleged errors that, according to WPS, invalidate the "new jurisdiction" aspect
of the significant weakness.  The first alleged error is that the CO should have recognized that
WPS fully complied with the RFP's requirement that the offeror demonstrate how its
"understanding of the jurisdiction-specific risk points for this contract resulted in the Offeror's
anticipated claim-type reviews (and volume per claim type) and the expected benefits to the
Medicare Program and/or return on investment the Offeror anticipates by focusing on these
claim types."  AR 1902; see also id. at 1904 (noting that CMS would evaluate MEFs by
determining whether the offeror's approach "demonstrates an understanding of the requirements

---

[5] The correct citation for this proposition is likely PlanetSpace, Inc., 92 Fed. Cl. at 540
n.20.

of the MAC mission-essential functions, the mission-essential workload requirements specific to the solicited jurisdiction, and the likelihood that its approach will result in high quality performance throughout the duration of the contract").  The second error alleged by WPS is that it received disparate treatment because CGS had the same [. . .] but CGS did not receive a weakness related to its failure to adapt its MR MEF strategy to a new jurisdiction.[6]  The court addresses these alleged errors in turn.

The CO's assignment of a significant weakness to WPS's MR is founded, in relevant part, on the requirement to tailor MR to J6.  The CO was concerned that the most concrete tailoring of MR that was planned in WPS's proposal was the apparent intent to [. . .].[7]  Id. at 7993 (citing id. at 7037, and also quoting an unidentified cell of WPS's BOE, with the quoted language matching text found in the administrative record at Tab 73, OY1 cell N1372).  Based on its review of the RFP, WPS's proposal, and the CO Determination Document, the court finds nothing arbitrary or capricious in this negative evaluation finding.  The CO could rationally find that WPS's MR approach was weak in demonstrating how [. . .] would be sufficiently tailored to the circumstances in J6.[8]

WPS's second challenge to the "new jurisdiction" aspect of the significant weakness finding is one of alleged disparate treatment—that CGS was similarly situated on this exact issue, but CGS did not receive a weakness for the RFP requirement for a jurisdiction-specific MR strategy.  Pl.'s Mot. 46 (asserting that the MR adaptation strategies of WPS and CGS are "identical").  The parties scour the text of both proposals and endeavor to show that either CGS had a better MR adaptation approach for J6, or that CGS's proposal, like WPS's, lacked a concrete MR adaptation strategy that meets the RFP requirement.  Given the complexity of the offerors' MR strategies, the court will not second-guess the CO's assessment of the risk of unsuccessful contract performance.  See E.W. Bliss, 77 F.3d at 449 (noting that the reviewing court should not second-guess the procuring agency's technical ratings).  The court therefore defers, to a significant degree, to the technical expertise of CMS on the distinction between CGS's proposal and WPS's proposal.  See Advanced Data Concepts, Inc., 216 F.3d at 1058 (noting that bid protest review is highly deferential).

The court finds, in any case, that the text of the MR strategy in CGS's proposal frames the adaptation of its [. . .] to the situation in J6 in different terms, and thus is not identical to WPS's MR adaptation strategy.  AR 2547-55.  CGS recognized the need for [. . .].  Id. at 2547.  CGS also informed CMS that it had [. . .].  Id.

In the WPS proposal sections criticized by the CO, WPS did not show how the risk points

---

[6]  [. . .].

[7]  Other MR strategies would be adapted from WPS's [. . .].  AR 7993-94.

[8]  WPS argues that its [. . .]."  Pl.'s Mot. 46.  That statement is irrelevant to the RFP requirement that the offeror show that its MR strategy would be properly adapted to J6.

for J6 affected WPS's MR staffing in J6.  Id. at 7140-44.  Thus, the explanation in WPS's proposal of the adaptation of MR priorities in J6 is qualitatively different than assertions provided in CGS's proposal.[9]  Although the distinctions between the adaptation of MR strategies to J6 proposed by CGS and WPS are subtle, there is a qualitative difference and these two offerors are not similarly situated.  The court sees no disparate treatment in the CO's assignment of a significant weakness to WPS's MR MEF, because the MR proposals of WPS and CGS are not "substantively indistinguishable."  Office Design Grp. v. United States, 951 F.3d 1366, 1373 (Fed. Cir. 2020).

For all of the above reasons, the significant weakness assigned by the CO to WPS's MR MEF survives arbitrary and capricious review.

### c. Significant Weakness for the Staffing of Multiple MEFs

The other significant weakness assigned to WPS's technical proposal engenders the most convoluted arguments from the parties, although, at bottom, it simply reflects the CO's overarching concern regarding the potential in WPS's proposal for understaffing, and incorrectly staffing, certain MEFs.  The descriptive language chosen by the CO for her overall critique of WPS's staffing approach information certainly applies here as well:  "contradictory," "ambiguous," "conflicting," and a general "fail[ure] to provide information and data that was required in the RFP."  AR 7992.  The introductory sentence to the CO's very detailed significant weakness analysis states:  "WPS[] is assigned a significant weakness for [its] approach to staff multiple Mission Essential Functions (MEFs) because of WPS' use of labor categories [that] are not intended to directly complete the type of workload proposed."  Id. at 7994-95.  Five of the seven MEFs suffered from this perceived flaw.  Id. at 7995, 7998.

To address the parties' arguments, the court begins with the most pertinent sections of the RFP.  Next, the court summarizes the CO's specific criticism of WPS's staffing of five of the seven MEFs.  Then, the court addresses WPS's primary arguments that attempt to invalidate the CO's assignment of this significant weakness.  Finally, the court considers WPS's contention that the CO's significant weakness constitutes disparate treatment because NGS also staffed some MEFs with labor categories that were just as objectionable under the CO's evaluation framework.

### i. RFP Guidance for the Staffing of MEFs

Turning first to the RFP, the court describes a few passages that include the guidance most referenced by the parties in their briefs.  Each offeror was required to explain its staffing of the MEFs by indicating the assumptions underlying the staffing data provided.  The offeror was directed to "identify and describe all other significant (i.e. material impact on technical approach

---

[9]  The CO was particularly concerned that WPS's high-level description of MR adaptation did not match its workload assumptions and its BOE.  AR 7992-93.  WPS has pointed to no analogous problem in CGS's proposal.

or proposed costs) proposal assumptions (workload or otherwise) used in its technical and business proposals, not otherwise identified or described in other parts of the Offeror's proposal." AR 1889.  Further, the assumptions proposal section could "also be used to provide additional narrative in support of the Offeror's completed BOE . . . ." Id.

As to the instructions for the BOE itself, two foundational terms of art are explained. CMS categorizes labor categories as either "productive" or "non-productive labor." Id. at 1641. As stated in the RFP, productive labor is "labor that is solely dependent on workload volume; as workload volume increases, productive labor hours increase at a proportionate rate." Id. Non-productive labor, in contrast, is "labor that is not solely driven by workload volume. Rather, 'non-productive' labor may be fixed labor with no ties to workload fluctuations, or it may be labor that increases based on other factors, such as manager hours that are based on management to staff ratios." Id.

In addition, certain cells in the offeror's BOE would identify the "labor categories that will perform or support a workload subcategory." Id. at 1645.  As supporting information for the offeror's labor categories, other cells in the spreadsheet would "describe the specific job tasks, qualifications, and experience for each proposed labor category." Id. at 1646.  The offerors were also provided with the following guidance:

> The Offeror shall use the workload subcategory names provided by CMS to identify the driver for a given productive labor category.  In the event that workload does not drive the proposed level of effort for a given labor category, the Offeror shall classify its non-productive labor categories with the label "Non-Workload Estimating Factor" and group these rows at the end of the respective workload category section. (See Example tab.)

Id. at 1641.

Seen from a more general perspective, the BOE and other relevant proposal sections would be read in tandem to assist in the evaluation of the offeror's Technical Approach:

> The purpose of the Basis of Estimate (BOE) is to assist the Centers for Medicare & Medicaid Services (CMS) in its evaluation of the Offeror's technical and business proposals.  Specifically, the BOE and other relevant historical data available to CMS will be used as a baseline tool for measuring and understanding how the Offeror proposes to perform the Statement of Work (SOW) requirements in contrast to how the Offeror has historically performed similar Medicare Administrative Contractor (MAC) work.  Variances between an Offeror's proposed and historical productivity rates, total number of hours and skill mix will be examined.  If these variances are not fully explained or supported in the proposal, the variances may result in a technical finding and/or a cost realism adjustment pursuant to Federal Acquisition Regulation (FAR) 15.404-1(d).

Id. at 1639.  As one final piece of RFP guidance, for each specified Contract Line Item Number ("CLIN") in the RFP, the offeror was required to provide the number of employee full-time

-16-

equivalents ("FTEs") that would staff each CLIN and each MEF.  Id. at 1896.

With these RFP terms in mind, the court turns next to the CO's assignment of a significant weakness to WPS's proposal for its staffing information regarding five of the seven MEFs.

### ii.  The CO's Assessment of a Significant Weakness for the Staffing of Five MEFs

The MEFs that were deemed to have problematic staffing information in WPS's proposal were Provider Enrollment, Provider Customer Service Program, Claims Processing, Appeals, and Audit and Reimbursement.[10]  Id. at 7994-98.  The overarching concerns were that WPS's staffing plan would "not provide knowledgeable, quality personnel in sufficient number in order to ensure quality . . . performance," and that non-productive staff were proposed for workload subcategories at significant percentages of the work to be accomplished.  Id.  The percentages of non-productive staff contributing to certain workload subcategories for these five MEFs, in the CO's estimation, are as follows:  [. . .].  Id.

For the calculation of these percentages, the CO looked at position descriptions in WPS's BOE, as well as the "primary labor category" for workloads that were identified in WPS's technical proposal.  Id. at 7995.  The CO then identified productive and non-productive staff assigned to workload subcategories and calculated the percentage of work assigned to non-productive staff.  Id. at 7995-98.  The calculation of these percentages appears to be reasonable, and the accuracy of these figures, as a product of such an analysis, is not subject to debate.  The focus of the parties' dispute is whether the CO's analytical framework was reasonable, a topic to which the court now turns.

### iii.  WPS's Challenge to the Significant Weakness

WPS's primary contentions regarding the significant weakness are that it was "based on a misreading of WPS's proposal and a misapplication of the instructions that CMS provided in the RFP."  Pl.'s Mot. 2.  The parties focus on a general criticism that the CO lodged against the staffing of these five MEFs, which begins with a quotation from WPS's proposal:

"Due to the complexity and length of the [provider] enrollment process, WPS uses an assembly line approach to processing.  This allows for a more focused effort on behalf of the employee and ensures that an appropriately skilled employee completes the next step in the process[.]"  This proposed approach indicates that multiple labor categories will touch a single application and no single application is completed by one FTE.  However, the WPS' BOE divided

---

[10]  Thus, the only MEF, aside from Implementation, that was not included in the CO's analysis for this significant weakness was Medical Review, which was assigned its own significant weakness.  See supra Section II.B.2.b.  Pursuant to the RFP, an offeror's staffing of the Implementation MEF was not subject to the same level of scrutiny as the other six MEFs.  AR 1896.

the RFP workloads into fractions across multiple labor categories totaling 100% of each RFP workload. However, this does not align with the assembly line approach described in the technical approach that would require multiple touches. Furthermore, the BOE indicates the proposed skill mix required to process the entirety of many key workloads included labor categories that do not process applications, i.e., [Quality Assurance ("QA")] Analyst.

AR 7995 (citing id. at 7161). The court discerns in WPS's detailed challenge to the CO's analytical framework three primary assertions: (1) the CO's characterization of some labor categories in WPS's proposal as non-productive employees was flawed; (2) the BOE template, provided by CMS, was itself the source of the CO's misunderstanding of WPS's proposal; and (3) there is no inherent contradiction between WPS's assembly line approach and the data provided in its BOE.[11] The court addresses each of these arguments in turn.

First, WPS argues that its proposed QA Analyst, and other proposed labor categories determined to be non-productive by the CO, were mischaracterized as non-productive. WPS asserts, for example, that its treatment of such employees as productive was made clear by the entry of workload percentages for these employees in its BOE. See Pl.'s Mot. 38 ("WPS provided a percentage . . . for each of the labor categories associated by Provider Enrollment Part B Initial Applications precisely because each of those labor categories is productive[.]"). But the CO was not required to accept any such designation of these labor categories in the BOE when she reviewed the entirety of the proposal to determine the nature of these proposed positions. The RFP emphasized that the BOE was a tool for understanding the offeror's technical proposal—these elements of the proposal were read together to provide an understanding of an offeror's staffing of the MEFs. AR 1888, 1896, 1904; see Banknote Corp. of Am., 365 F.3d at 1353 ("[W]e must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc))). Thus, WPS cannot rebut the CO's characterization of its proposed employees as non-productive simply because its BOE included data for these labor categories in cells that were normally reserved for productive employees.

More fundamentally, WPS disagrees with the CO's assessment that these proposed employees would not provide "labor that is solely dependent on workload volume." Id. at 1641. In essence, WPS argues that it has a more accurate interpretation of the productive labor categories definition established by the RFP, as applied to its proposed employees, than does the CO. But even WPS's own gloss on that definition, as stated in its proposal, shows that WPS loosened CMS's definition for the description of its staffing of the MEFs. Compare id. at 1641 ("labor that is solely dependent on workload volume"), with id. at 7040 ("labor that is driven by

_____

[11] WPS also argues that it was irrational for the CO to assign a significant weakness to a BOE and staffing approach that WPS has used in other MAC jurisdictions. However, the court's concern here is whether the significant weakness assigned by the CO in this procurement was rational under the RFP and other controlling authorities.

workload volumes").  The only other substantive argument presented by WPS on this topic is related to various statements regarding the QA Analyst position that can be found in its BOE.[12]  Even when all of the referenced elements of the position description for QA Analyst are considered, the CO's characterization of this labor category as non-productive in the context of the Provider Enrollment MEF is reasonable.[13]  The court concludes that WPS has not met its burden to show that the CO's concern regarding the non-productive labor categories proposed by WPS, and her concern regarding WPS's stated intent that these employees would perform significant percentages of the workloads in five MEFs, were either arbitrary or capricious.

Second, WPS appears to blame any conflicts or shortcomings in its BOE, and any contradictions between its BOE and other parts of its proposal, on the formulas embedded into the spreadsheet template provided by CMS, as well as the RFP's requirement that these formulas and certain cell values not be altered by the offeror.  To the extent that WPS challenges the RFP as providing a flawed framework for the evaluation of the staffing of the MEFs, the time to challenge the BOE template and related staffing information required of offerors was before proposals were due on April 1, 2019.  See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").  It is simply too late to argue that WPS could not clearly and successfully communicate its staffing information in the BOE template.[14]

_____

[12]  WPS also relies on a statement supplied by the CO that was part of the GAO protest. AR 9983-87.  Not only does this statement fail to illuminate any flaw in the significant weakness assigned to WPS, but its value as a post-hoc supplement to the contemporaneous record of the elimination decision is negligible.  See, e.g., Vanguard Recovery Assistance v. United States, 99 Fed. Cl. 81, 102 (2011) ("Post hoc declarations and arguments will be discounted or disregarded.")

[13]  The CO's determinations regarding non-productive employees vary depending on the workload subcategory.  A Medical Director may be deemed productive or non-productive, depending on the workload in question, as is true for a QA Analyst.  AR 7995.  The roles for these two labor categories in WPS's BOE vary greatly per workload subcategory.  See id. Tab 73, Position Description cells D292-D311, D317-D349.

[14]  In its reply brief, WPS suggests that a latent ambiguity in the RFP did not alert WPS to the potential for a negative evaluation of its staffing of the MEFs.  This argument, which is based on information known to WPS well before this protest was filed, see AR 8170-71, is untimely, see Novosteel SA v. United States, 284 F.3d 1261, 1264 (Fed. Cir. 2002) (stating that arguments raised for the first time in a reply brief are waived).  Even if this argument had been timely raised, the functioning of the BOE cells was apparent to WPS, and the inherent difficulty of presenting a clear and sufficiently detailed roadmap to WPS's staffing of the MEFs through the BOE and other proposal sections was apparent as well.  This aspect of the RFP is patent, and WPS concedes it encountered this aspect of the solicitation before this MAC competition.  See Pl.'s Reply 22 (stating that WPS had previously encountered an "identical . . . BOE template and

Third, WPS contends that the CO misread its proposal because there was no contradiction between its BOE and its staffing approach.  The parties' arguments on this issue are wide-ranging and, at times, far removed from the text of the RFP, the CO Determination Document, and WPS's proposal.  The court returns to the CO's overall critique of WPS's staffing information, where she found that it was "contradictory," "ambiguous," and "conflicting," and that "WPS failed to provide information and data that was required in the RFP."  AR 7992.  The court also reemphasizes the introductory sentence to the CO's very detailed significant weakness analysis:  "WPS[] is assigned a significant weakness for [its] approach to staff multiple Mission Essential Functions (MEFs) because of WPS' use of labor categories [that] are not intended to directly complete the type of workload proposed."  Id. at 7994-95.  Along with this broader view, the CO states more specifically that "WPS' BOE divided the RFP workloads into fractions across multiple labor categories totaling 100% of each RFP workload [but] this does not align with the assembly line approach described in the technical approach that would require multiple touches."  Id. at 7995.

The record reflects that the CO could rationally find that WPS's BOE data did not "align" with the other information regarding an assembly line approach that is found in various volumes of WPS's proposal.  Only one citation to WPS's proposal is required to show that there is adequate support for the reasonableness of the CO's finding.  WPS attempted to explain its BOE with the following passage in a section titled "WPS Basis of Estimate (BOE) Narrative":

> It should be noted that not all workloads are completed by a single position.
> There are situations in which multiple positions would work on the same
> workload either through collaboration (e.g., two people looking at one claim
> together) or through division of tasks (e.g., similar to an assembly line type
> process in which Position I performs task X and Position II performs task Y to
> complete all tasks required to process the workload).  The Historical Percentage
> of Workload Processed by a Position should NOT be interpreted to mean that a
> position completes a percentage of the workload in its entirety.  For example, the
> Percentage Workload Processed by Position may show a supervisor working 10%
> of a workload in an area, when they are only helping their team to resolve
> questions that may arise related to the workload.

Id. at 7032.  At bottom, in this passage WPS communicated to CMS that its BOE cells, with actual numbers representing percentages of workload performed by the identified labor categories, might not reflect the reality of its assembly line approach.  This is an alignment problem that the CO rationally incorporated into the significant weakness she assigned to WPS's staffing information for five of its seven MEFs.

According to NGS, "WPS provided no clarification or instruction for how CMS was to evaluate WPS' proposal if CMS could not rely on the percentages listed in the BOE."  NGS Mot.

_____

instructions").

27.  WPS offers no direct rebuttal of this argument in its reply brief.  Yet, WPS appears to concede that the BOE cells reporting the percentage of workload processed by labor category are important to CMS for evaluation purposes.  See Pl.'s Reply 20 (stating that "the relative level of effort required by each labor category, which is what the BOE was supposed to do," would provide "useful information" (citing AR 1646-47)).  The alignment problem noted by the CO thus is just one example of WPS's "fail[ure] to provide information and data that was required in the RFP."  AR 7992.  For these reasons, the alignment problem portion of the significant weakness assigned to WPS's staffing information for five of seven MEFs survives arbitrary and capricious review.

The court concludes that the CO reasonably assigned WPS's proposal a significant weakness for the staffing of five of the seven MEFs.  WPS raises one final argument against this significant weakness, and it is to this argument that the court now turns.

### iv.  WPS's Disparate Treatment Argument

WPS contends that disparate treatment invalidates the significant weakness assigned to its staffing of five of the seven MEFs.  According to WPS, there was disparate treatment because NGS received merely a weakness, not a significant weakness, for non-productive staff proposed for some of the workloads of certain MEFs.  WPS asserts that the only real "difference between the two findings [of the CO] is that WPS's is associated with five MEFs whereas NGS's is associated with four MEFs."  Pl.'s Mot. 27.  There are two problems with WPS's disparate treatment argument.[15]

First, the fact that the awardee was assigned a weakness for precisely the type of proposal risk that was discerned in WPS's proposal is a sign of a consistent, fair, and rational evaluation approach.  In other words, CMS rationally looked at the staffing of MEFs with non-productive staff as a problem whether it was in NGS's proposal or in WPS's proposal.  The negative evaluation of this aspect of WPS's proposal is supported, not necessarily undermined, by the CO's similar finding regarding NGS's proposal.

Second, the distinction between four or five MEFs having this staffing problem is not insubstantial, as argued by this passage in NGS's motion:

> CMS' evaluation also demonstrates that in addition [to] NGS' non-productive labor issue touching fewer MEFs, NGS' Weakness covered a far smaller magnitude of CLINs and workload as well.  For NGS, the TEP found that only

---

[15]  WPS argues, too, that CGS's receipt of two weaknesses for its staffing of MEFs for similar reasons, but not a significant weakness, is another example of disparate treatment.  WPS is comparing apples to oranges with CGS.  There is no mention of non-productive staff in the weaknesses assigned to CGS.  See AR 8689-90, 8692-93.  There may be parallels, but the CO's assessment does not include the same evaluation commentary as that found in the negative ratings assigned to WPS and NGS.

> four CLINs were impacted by the non-productive labor issue, and that the
> percentages of non-productive workload were not severe enough to impact
> performance significantly.  This stands in stark contrast to CMS' findings
> regarding WPS' proposal, which covered <u>17 different CLINs</u> over the five MEFs
> . . . .

NGS Mot. 25 (citing AR 8105-08, 8122-23).  WPS did not rebut this argument.

A comparison of the significant weakness assigned to WPS and the weakness assigned to NGS shows that the CO could rationally find proposed non-productive staff for the MEFs to be a significant weakness for WPS and only a weakness for NGS.  <u>Compare</u> AR 7994-98, <u>with</u> <u>id.</u> at 8638-39.  There is both the number of impacted CLINs to consider, and the fact that the significant weakness for WPS also took into account the additional issue of the alignment problem between WPS's BOE and its assembly line approach.  Because the proposals were not "substantively indistinguishable," <u>Office Design Grp.</u>, 951 F.3d at 1373, the court finds no disparate treatment in the significant weakness assigned to WPS for the staffing of five of the seven MEFs.  Having considered all of WPS's arguments, this significant weakness has not been shown to be arbitrary or capricious.

### d.  Reasonable Elimination Based on Unacceptable Rating for WPS's Technical Approach

The court has tested every negative evaluation rating assigned to WPS's Technical Approach under the arbitrary and capricious standard of review.  Each weakness and each significant weakness is rational and in accordance with the evaluation scheme of the RFP.  Because these negative evaluation ratings are unobjectionable, so too is the elimination of WPS from this competition as technically unacceptable.  Moreover, because the CO's elimination of WPS's proposal was based solely on the Unacceptable rating on Technical Approach, the parties' dispute regarding WPS's Low Confidence rating on Past Performance is moot.

### 3.  Standing of an Eliminated Offeror to Challenge Subsequent Steps in Evaluation Process

Returning now to the standing concerns raised by NGS, the court considers whether WPS, properly eliminated from this competition, has standing to challenge agency actions that occurred after that elimination and that culminated in the award to NGS.  It concludes that because there could be no prejudice to WPS, an eliminated offeror, flowing from any procurement errors that later occurred in the selection of NGS as awardee, WPS lacks standing to assert its remaining protest grounds.  Indeed, WPS makes no attempt to directly rebut this particular standing argument raised by NGS.

Instead, the court discerns three distinct arguments raised by WPS that might obliquely address the standing question as it applies to postelimination procurement events.  First, relying on a bid protest decision of this court, WPS argues that CMS's "irrational actions trigger a presumption of prejudice that neither the Government nor NGS can rebut."  Pl.'s Reply 4 (citing <u>HVF W., LLC v. United States</u>, 146 Fed. Cl. 314, 331-32 (2019), <u>denying reconsideration</u>, 146 Fed. Cl. 451 (2020), <u>appeals docketed</u>, Nos. 20-1414, 20-1583 (Fed. Cir. Jan. 30, 2020, Mar. 18,

2020)).  The court notes that the presumption of prejudice discussed in HVF West, LLC, as well as the presumption of prejudice discussed in the case quoted in HVF West, LLC, is a presumption for the determination of prejudice once the protestor has succeeded on the merits of its protest allegations, not a presumption for the purposes of determining standing.  HVF W., LLC, 146 Fed. Cl. at 332 (quoting, in a parenthetical, Caddell Constr. Co. v. United States, 125 Fed. Cl. 30, 50 (2016)).  Thus, HVF West, LLC and Caddell Construction Co. have no bearing on the standing question presented here.

Second, WPS invokes hypothetical discussions with offerors and proposal revisions to buttress its prejudice allegations.  It relies, in this regard, on another bid protest decision of this court, which concluded that the protestor was prejudiced by unequal discussions and that the outcome of the procurement could not be predicted with any certainty because of a likely opportunity for proposal revisions.  See Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 419-22 (2018).  But the discussion of prejudice in Centerra Group, as in HVF West, LLC, focused on the prejudicial effect of proven errors, not the prejudice required to establish standing.  Further, Centerra Group is distinguishable because the protestor in that procurement was not rated technically unacceptable, and was not eliminated from the competition before the unequal discussions with its competitor occurred.  Id. at 411-12.  The court finds no support in Centerra Group for WPS's standing to assert its remaining protest grounds.

Third, when arguing the merits of its OCI-related protest grounds, WPS contends that its elimination from the competition, even if that agency action is deemed proper by the court, would not change the prejudicial nature of an erroneous award to NGS:

> Moreover, WPS was prejudiced by CMS's relaxation of the RFP's requirements even if the Court agrees that WPS's unacceptable technical rating was proper. This is because the record demonstrates a substantial chance that CMS would have conducted discussions to permit NGS to address the defects in its proposal, which would also have permitted WPS to revise its proposal.

Pl.'s Reply 14.  But it would have been illogical for CMS, once it had addressed its OCI concerns with the apparent awardee, to reverse course and reinstate an offeror that had been eliminated from the competition as technically unacceptable four months earlier.  The hypothetical scenario of WPS entering into discussions with CMS is not consistent with the record of this procurement.  Palmetto and CGS were the only offerors who might have been prejudiced and, consequently, would have had standing to assert protest grounds such as the OCI-related protest grounds asserted by WPS, because they had not been eliminated for technical unacceptability reasons.

As guided by the precedent of the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), prejudicial errors are those that impede the protestor from receiving the contract award, or, in other words, that "interfere[] with its ability to receive the contract award." Labatt Food Serv., 577 F.3d at 1380.  For example, an offeror that submits an untimely proposal has no standing to complain of an irregularity in the consideration of timely proposals.  See id. at 1381 (noting that a procurement irregularity was "not relevant to [the protestor's] removal from

the competition [because] [i]t was removed from the competition for an untimely submission"). Once an offeror has been properly removed from a competition, the agency's erroneous actions vis-à-vis the remaining offerors are not prejudicial to that eliminated offeror bringing a bid protest in this court.  This is so because the protestor's "proposal would not have been improved and its chances of securing the contract would not have been increased if [the agency] cured the [subsequent] error."  Id. at 1380-81.

Unless there is a "connection between the government's [alleged] error and [the protestor's] failure to secure the contract . . . , there is no injury to redress, and no standing to sue."  Id. at 1381.  In the terms of the Federal Circuit's Labatt Food Service opinion, prejudicial harm so as to support bid protest standing is "particularized harm."  Id. at 1380.  Under this standard, WPS was not prejudiced by any of the alleged errors in its remaining protest grounds and thus lacks standing to assert them.  See, e.g., Commissioning Sols. Glob., LLC v. United States, 97 Fed. Cl. 1, 8 (2011) (holding that where the protestor was not in contention for the award of two particular contracts because it lacked the required relevant experience, it had no standing to assert errors in the competition for those two contracts).

Even though WPS lacks standing to assert its OCI-related protest grounds, the court proceeds, in the alternative, to examine WPS's remaining allegations of agency error under the arbitrary and capricious standard of review.  It is often prudent, and it may further judicial economy, to examine all of the procurement errors alleged by the protestor.  Consequently, the analysis that follows should not be construed as an advisory opinion.  WPS's remaining contentions focus on the OCIs that were the topic of the fifth volume of NGS's proposal and that were the subject of extensive communications between CMS and NGS.

### 4.  OCI-related Protest Grounds

The court begins its discussion of OCIs by referencing the RFP, which uses the COI acronym.[16]  The most detailed set of RFP instructions regarding the offeror's disclosure of COIs is provided in Attachment J.10, "Contractor Business Ethics, Conflicts of Interest and Compliance Program Requirements."  AR 1635-38.  Another set of instructions, Attachment J.11, "Contractor Personal Conflicts of Interest Financial Disclosure Template," addresses the COIs of individuals.  Id. at 694-702.  Also, in the answers provided to offeror questions in Amendment 0002, CMS indicated that the notification procedures in FAR 9.504(e) "will be followed" for COIs.  Id. at 1783-84.

In addition, four other key provisions regarding COIs were included in the instructions for the submission of proposal Volume V.[17]  First, CMS noted that "[i]n accordance with FAR

---

[16]  The court returns to the OCI acronym, the more generally accepted term for this issue, in its discussion of WPS's arguments.

[17]  Waiver of COIs, also discussed in the RFP, AR 1912 (citing FAR 9.503), is not an issue in this protest.

9.5, the Government must ensure that an Offeror and its proposed Subcontractor(s) is/are free of All Organizational/Personal Conflict of Interest (hereinafter collectively or individually referred to as COI)." Id. at 1911.  Second, "[t]he Business Ethics, Conflicts of Interest and Compliance information is so material to the award of this contract that a proposal failing to provide the requirements identified in Attachment J.10 . . . may be ineligible for award."  Id.  Third, offerors were notified that only the "apparent successful [o]fferor" would receive a review of its COIs, although that review would not produce an evaluation score or rating.  Id. at 1912.  Fourth, CMS indicated that COIs might be mitigated so as to permit award, pursuant to FAR 9.504(e), and that communications with the offeror to discuss mitigation would be permitted.  Id.

Turning to NGS's proposal Volume V and its review by CMS, NGS discussed therein a number of COIs, either actual, potential, or apparent, and also discussed its COI mitigation plan.  AR Tab 22e.  Once NGS was selected as the apparent successful offeror, extensive communications between CMS and NGS took place on the COI issue.  Id. Tabs 34, 36-37, 39, 41-44, 46-48.  The CO eventually determined that "no significant actual or potential conflicts were found that are not sufficiently mitigated."  Id. at 8635.

WPS contends that the award to NGS was improper due to OCIs that rendered NGS ineligible for award.  The nature of the OCIs in NGS's proposal is that of impaired objectivity because, according to WPS, "NGS is affiliated with dozens of healthcare providers that will submit millions of dollars in [Medicare] claims that NGS will review and determine whether to pay under the contract."  Pl.'s Mot. 18 (citing AR 8233-34).  WPS challenges the effectiveness of the mitigation of NGS's OCIs, as well as the propriety of the communications that were held between CMS and NGS to discuss OCIs and OCI mitigation.  The court begins with the regulatory context that applies to WPS's criticism of the effectiveness of NGS's OCI mitigation plans.

### a.  Whether NGS's Mitigation of OCIs Was in Accordance With Regulation

There appears to be no dispute that NGS has OCIs because of its affiliation with health care providers whose Medicare claims will be processed by the J6 MAC, and for other reasons as well.  AR 8233-36, 8407-09.  The questions for the court are whether NGS's OCIs are significant, and if so, whether the mitigation of OCIs proposed by NGS is reasonable and in accordance with regulation.  See FAR 9.504(a) (stating that the CO must "[a]void, neutralize, or mitigate significant potential conflicts before contract award").  The CO described NGS's four OCIs in this manner:  (1) "actual," but "may not be significant" OCI; (2) "apparent," with "the OCI concern . . . highly attenuated" OCI; (3) "clear potential personal" OCI; and (4) "potential" OCI.  AR 8408-09.  The record reflects that the OCIs discussed by the CO, in combination, are significant and trigger the CO's obligation to ensure that the OCIs are effectively mitigated.[18]

_____

[18]  Defendant overreaches when it argues that the CO found NGS's sole actual OCI to be insignificant because she stated that this OCI "may not be significant."  AR 8408.  Although the court would defer to the CO's judgment as to the significance of an OCI, see Turner Constr. Co. v. United States, 645 F.3d 1377, 1386 (Fed. Cir. 2011) (stating that a "CO has considerable discretion in determining whether a conflict is significant" (citing PAI Corp. v. United States,

As to WPS's assertion that NGS's OCI mitigation plan was not reasonable, however, the court and WPS must part ways.  The CO exercises considerable discretion in "the evaluation of mitigation proposals," and her inquiry in this regard is "fact-specific."  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1382 (Fed. Cir. 2009) (citing FAR 9.505; ARINC Eng'g Servs., LLC v. United States, 77 Fed. Cl. 196, 202 (2007)); see also PAI Corp., 614 F.3d at 1351 (noting that the court's inquiry into OCI matters hinges on "whether the contracting officer failed to exercise proper discretion").  Here, the record shows that CMS undertook extensive communications with NGS to understand the OCIs inherent in the proposal and the mitigation strategies that would address significant potential conflicts.

The court has reviewed NGS's mitigation plan, its communications with CMS explaining how that plan would be effective, the CO's review of all four remaining OCIs in NGS's proposal, and the CO's determination that "no significant actual or potential conflicts were found that are not sufficiently mitigated."  AR 8635.  The record shows her "exercise of common sense, good judgment, and sound discretion . . . in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it."  FAR 9.505.  The court concludes that the CO's acceptance of NGS's OCI mitigation plan was in accordance with the broad framework provided for such reviews in the FAR.[19]  The court now turns to WPS's other arguments challenging the reasonableness of NGS's OCI mitigation plan, which require a closer look at the mitigation plan itself.

### b.  Whether NGS's OCI Mitigation Plan Was in Accordance With the RFP and Other Authorities

NGS's OCI mitigation plan is presented in its proposal Volume V, AR 5542-49, and again in its communications with CMS once it had been selected as the apparent successful offeror.  One important difference in the OCI mitigation plan as originally proposed, and the OCI mitigation plan approved by the CO, flows from the divestment from NGS's corporate family, in the interim period, of four health care providers that would have otherwise caused OCIs in J6.  See id. at 8407-08 (noting that "[s]ignificant portions" of the communications between CMS and NGS regarding OCIs had focused on the OCIs related to these four health care providers).  Thus, the amount of OCI mitigation required for NGS to perform as the J6 MAC was significantly reduced after it submitted its proposal.  Id. at 8408.

_____

614 F.3d 1347, 1352 (Fed. Cir. 2010))), the CO here did not clearly state that any of NGS's OCIs were insignificant.

[19]  FAR 9.505 also states that "[e]ach individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract."  NGS was the incumbent contractor in J6.  AR 3860.  The CO's understanding of how NGS's OCI mitigation plan would be effective in J6 where it had already been operating for several years is entitled to considerable deference.  Cf. id. at 8409 (CO's OCI analysis) (noting that, according to NGS, one potential OCI "has never happened to date, and is unlikely to ever happen").

NGS's OCI mitigation plan is described as having [. . .].  Id. at 5542, 8209, 8408.  WPS is most concerned with the [. . .] component;[20] for this reason the court will restrict its observations to this component of NGS's OCI mitigation plan.[21]  WPS first contends that the [. . .] violates various provisions of the RFP, and then argues that such an [. . .] is not reasonable in light of decisions of the GAO that have reviewed other OCI mitigation plans.[22]  The court turns first to WPS's reliance on the RFP in its attempt to invalidate the [. . .] proposed by NGS in its OCI mitigation plan.

WPS argues that there are two aspects of the [. . .] that violate the RFP:  (1) NGS proposed to [. . .] but the practice of [. . .] was forbidden; and (2) NGS was required to disclose [. . .] but did not.  For the first issue, WPS points to this statement in the RFP:  "CMS will not accept any type of management discount, corporate contribution, or corporate investment discount, or anything similar, that is proposed to lower an Offeror's or subcontractor's estimated cost."  Id. at 1910.  Neither NGS nor defendant presented a timely rebuttal to this argument.

WPS's argument, however, is not persuasive because the RFP does not categorically [. . .] by the offeror.  Indeed, as WPS itself acknowledges, NGS included a [. . .].  Pl.'s Mot. 14 (citing AR 4153).  Further, CMS interpreted the RFP to permit [. . .] expenditures for OCI mitigation.  See AR at 8037 (citing FAR 31.201-6 as support for NGS's [. . .]).  Nor is there any indication that NGS proposed a corporate discount or contribution, or that CMS framed the OCI mitigation plan costs in those terms.  See id. ([. . .]); see also id. at 8154 (noting that NGS's mitigation costs will not be treated as [. . .]).  Finally, the RFP acknowledges the potential for [. . .] in the administration of the J6 MAC contract.  See id. at 1811 (citing FAR 42.704(b)), 1812 (citing FAR 52.216-7).  WPS has not met its burden to show that the [. . .] of the [. . .] violated the RFP's prohibition against corporate discounts, contributions, or similar cost reduction

---

[20]  WPS did not criticize the effectiveness of the [. . .] of NGS's OCI mitigation plan in its opening brief.  Thus, any arguments regarding the effectiveness of these components raised in WPS's reply brief are untimely.  Novosteel SA, 284 F.3d at 1264.  Even if WPS's cursory argument in this regard had been timely raised, it is not persuasive.  See Pl.'s Reply 16 (arguing that CMS cannot [. . .]).  The court trusts that the CO appropriately found value in these [. . .] of NGS's OCI mitigation plan and defers to her judgment in this regard.

[21]  Other OCI mitigation plan components were discussed by CMS and NGS in their communications.  See, e.g., AR 8194, 8200-01, 8209-14, 8228-32.  Although the court's discussion focuses on just one component of NGS's OCI mitigation plan, the other components are not insubstantial and contribute to the effectiveness and reasonableness of the plan.

[22]  WPS casts a broad net for authority in its quest to impugn the reasonableness of the [. . .].  GAO decisions, however, provide the most specific statements upon which WPS relies.  It would be inefficient to address every citation in WPS's briefs and to do so would add nothing to the court's analysis here, which, as explained above, is a holding in the alternative undertaken for the purpose of judicial economy.

strategies.

As for NGS's purported flouting of the RFP's requirement that an offeror disclose its subcontractors, the parties debate whether this requirement applies to an as yet undetermined [. . .] subcontractor.  WPS asserts that the "RFP required offerors to identify all proposed subcontractors," and that this requirement included [. . .] addressing OCIs.  Pl.'s Mot. 14 n.7 (citing AR 1884, 1909).  The court agrees with NGS, however, that a rational interpretation of the RFP permits an offeror to not include an [. . .], to be chosen at a later date, in its disclosed subcontractors information, because the disclosure requirement in the RFP was tied to significant subcontractors performing SOW requirements.  AR 1884, 1893, 1909.  WPS fails to meet its burden to show that the [. . .] violated the RFP.

Finally, WPS asserts in emphatic terms that an [. . .] cannot mitigate the OCIs because NGS will have already performed the claims processing work that is compromised by the OCIs.  WPS's preferred formulation of this criticism is that the mitigation plan "mitigates nothing."  Pl.'s Mot. 17; Pl.'s Reply 14.  Further, WPS asserts that the "only recognized mitigation strategy for NGS's OCI is for one of NGS's subcontractors to perform work involving NGS's [. . .]."  Pl.'s Mot. 20 (citing Leidos, Inc., B-417994, 2019 WL 7019036, at *9 (Comp. Gen. Dec. 17, 2019)).  In WPS's view, NGS could not use an [. . .]—it needed to firewall certain Medicare claims processing tasks so that NGS never touched them.[23]

The court finds no merit in WPS's challenge to the reasonableness of NGS's OCI mitigation plan.  The review of OCI mitigation plans is fact-specific and is committed to the discretion of the CO.  PAI Corp., 614 F.3d at 1351; Axiom, 564 F.3d at 1382.  In other words, simply because the GAO has found a firewall to be the proper OCI mitigation strategy in some protests is not determinative here.

Further, the Leidos decision relied upon by WPS concerned an impaired objectivity OCI which was quite different in nature.  The OCI in Leidos involved multiple government contracts and initiatives for which a proposed subcontractor for the protestor would be reviewing strategies and advising the government on projects where it could quite easily favor itself.  2019 WL 7019036, at *9.  Here, the NGS OCIs were attenuated, at least in part, and the CO concluded that for these OCIs an [. . .] was reasonable and appropriate.  Having reviewed the record of NGS's OCI mitigation plan and the CO's review of that plan, the CO's decision falls well within a CO's

_____

[23]  WPS also argues that NGS's OCI mitigation plan could not be viewed as reasonable because it did not identify the [. . .], and thus lacked "the necessary level of detail."  Pl.'s Reply 18 (quoting Cahaba Safeguard Administrators, LLC, B-401842.2, 2010 CPD ¶ 39 (Comp. Gen. Jan. 25, 2010)).  However, the lack of a [. . .] is not analogous to the OCI mitigation plan in Cahaba that proposed three "potential approaches," which was flawed because the approaches lacked "details explaining how any of the plans would work or when they would, or could, be implemented."  2010 CPD ¶ 39.  WPS's contention that NGS's OCI mitigation plan was not reasonable—merely because the identity of [. . .] was not specified—is not supported by the authority cited and is not, in any event, persuasive.

"great latitude in handling OCIs." Turner Constr. Co., 645 F.3d at 1384.  The CO's approval of NGS's OCI mitigation plan was in accordance with the RFP and precedent and thus would survive arbitrary and capricious review if WPS had standing to assert this protest ground.

### c.  Whether CMS Entered Into Improper and Unequal Discussions With NGS Regarding OCI Mitigation

WPS's final challenge to the CO's acceptance of NGS's OCI mitigation plan and the award of the J6 MAC contract is that NGS was allowed to modify its proposal through the communications held between CMS and NGS on the topic of OCI mitigation, and that these modifications show that discussions were improperly held with only NGS and not the other offerors.  To the extent that this challenge is based on alleged changes NGS was allowed to make to cure the alleged RFP "violations" in its OCI mitigation plan, as discussed above, that particular challenge fails because there were no violations of the RFP in the [. . .] aspect of the plan, or in the subcontractor disclosure aspect of the plan, that required modification of NGS's proposal.  What remains, then, is WPS's challenge to the communications between CMS and NGS, labelled exchanges, on the basis that these communications were more substantive than clarifications and were actually discussions.

WPS alleges that "NGS's [communications with CMS] revised the accounting policies and procedures on which NGS's proposal was based" because NGS indicated it would [. . .] of its OCI mitigation plan.  Pl.'s Mot. 15.  Defendant argues, and the court must agree, that WPS has not identified any change in NGS's OCI mitigation plan, technical volume, or business volume that can be tied to NGS's statement that it would be treating its OCI mitigation plan costs [. . .].  See Def.'s Mot. 41 ("NGS merely responded to CMS's clarifying questions with clarifying information—no proposal change, [hence] no discussions.").  Because the dividing line commonly drawn between clarifications and discussions is that proposal revisions can only be made through discussions, WPS has not shown that this aspect of the communications between CMS and NGS constitutes discussions.  See, e.g., DynCorp Int'l LLC v. United States, 76 Fed. Cl. 528, 541 (2007) ("Discussions . . . are 'exchanges . . . between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal.'" (second alteration in original) (quoting FAR 15.306(d))).

Because WPS has identified no proposal revisions, WPS has not shown that CMS and NGS engaged in discussions.  Without discussions, any allegation of improper or unequal discussions is unfounded.  The court therefore concludes that the CO's acceptance of NGS's OCI mitigation plan and the award of the J6 MAC contract would survive arbitrary and capricious review if WPS could be considered to have standing to bring its OCI-related protest grounds.

### III.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.  The court summarizes here its findings of fact and conclusions of law.

WPS has standing to contest its elimination from the competition.  However, that elimination decision withstands arbitrary and capricious review.  Consequently, WPS lacks standing to challenge subsequent procurement events leading to the award to NGS.  In the alternative, even if WPS had standing for its OCI-related protest grounds, these protest grounds lack merit.

Because WPS has not succeeded on the merits of its protest, the court need not discuss the factors that permit this court to award injunctive relief to a protestor.  See Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 999 (Fed. Cir. 2018) (stating that "proving success on the merits is a necessary element for a permanent injunction").

The court therefore **GRANTS in part** and **DENIES in part** NGS's motion to dismiss for lack of standing.   The court **GRANTS** NGS's and defendant's motions for judgment on the administrative record.  The court **DENIES** WPS's motion for judgment on the administrative record.  The clerk is directed to enter judgment accordingly and dismiss the case.  No costs.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, **by no later than Tuesday, November 17, 2020**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

Further, the court reminds the parties of their obligation under paragraph 12 of the protective order filed on July 13, 2020, to file redacted versions of protected documents for the public record.  If the parties have not already filed redacted versions of their motions and supporting briefs, they shall file a joint status report **by no later than Tuesday, November 17, 2020**, explaining the reason for the delay.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge

-30-